1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3                                    No. 1:19-cv-12533-WGY

4    BIO-RAD LABORATORIES, INC., et al
                  Plaintiffs
5    vs.

6    10X GENOMICS, INC.
                  Defendant
7
                                     No. 1:19-cv-11587-WGY
8

9    BIO-RAD LABORATORIES, INC., et al
                  Plaintiffs
10   vs.

11   STILLA TECHNOLOGIES, INC., et al
                  Defendants
12
                         * * * * * * * * *
13

14                   For Zoom Hearing Before:
                     Judge William G. Young
15

16                      Markman Hearing

17
                     United States District Court
18                   District of Massachusetts (Boston)
                     One Courthouse Way
19                   Boston, Massachusetts 02210
                     Thursday, September 10, 2020
20

21                        * * * * * * * *

22
                  REPORTER: RICHARD H. ROMANOW, RPR
23                     Official Court Reporter
                     United States District Court
24       One Courthouse Way, Room 5510, Boston, MA 02210
                     bulldog@richromanow.com
25

```
 1                A P P E A R A N C E S

 2   EDWARD REINES, ESQ.
     DEREK C. WALTER, ESQ.
 3   AUDRA SAWYER, ESQ.
     JUSTIN CONSTANT, ESQ.
 4   GARLAND STEPHENS, ESQ.
         Weil, Gotshal & Manges, LLP
 5       201 Redwood Shores Parkway
         Redwood Shores, CA 94065
 6       (650) 802-3022
         Email: Edward.reines@weil.com
 7       For Plaintiff, Bio-Rad Laboratories

 8
     MICHAEL J. TUTEUR, ESQ.
 9   GEOFFREY RAUX, ESQ.
     RUBEN J. RODRIGUES, ESQ.
10       Foley & Lardner, LLP
         111 Huntington Avenue, Suite 2500
11       Boston, MA 02199
         (617) 342-4000
12       Mtuteur@foley.com
         For Plaintiff President and Fellows of Harvard College
13

14   SARAH CHAPIN COLUMBIA, ESQ.
         McDermott, Will & Emery, LLP
15       28 State Street
         Boston, MA 02109
16       (617) 535-4074
         Email: scolumbia@mwe.com
17   and
      MATTHEW D. POWERS, ESQ.
18    AZRA M. HADZIMEHMEDOVIC, ESQ.
      PAUL T. EHRLICH, ESQ.
19   ROBERT L. GERRITY, ESQ.
     JENNIFER K. ROBINSON, ESQ.
20       Tensegrity Law Group, LLP
         555 Twin Dolphin Drive, Suite 360
21       Redwood Shores, CA 94065
         (650) 802-6010
22       Email: matthew.powers@tensegritylawgroup.com
         For Defendant 10X Genomics, Inc.
23


24


25    (Continued.)
```

1   (Continued.)

2

3   ELIZABETH G.H. RANKS, ESQ.
    WHITNEY A. REICHEL, ESQ.
4   JUANITA R. BROOKS, ESQ.
    QIUYI WU, ESQ.
5   NICOLE WILLIAMS, ESQ.
    MICHAEL LAMARRE, ESQ.
6      Fish & Richardson, P.C. (Boston.)
       One Marina Park Drive
7      Boston, MA 02210-1878
       (617) 542-5070
8      Email: Wreichel@fr.com
       For Defendant Stilla Technologies, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S
 2         (Begins, 2:00 p.m.)
 3         THE CLERK:  Now hearing Civil Matter 19-11587,
 4    Bio-Rad versus Stilla, and 19-12533, Bio-Rad versus 10X.
 5         THE COURT:  Good afternoon, counsel.  This is a
 6    hearing held under our zoom facilities.  Hosting the
 7    hearing is Courtroom Deputy Clerk, Jennifer Gaudet.  We
 8    have on the line our Official Court Reporter, Rich
 9    Romanow, and law clerks.  It is a hearing that naturally
10    is open to the press and public, and so I have no way of
11    knowing whether any members of the press or public are
12    on the line, but if they are, I must instruct you to
13    keep your microphones muted.  And should there be any --
14    well, keep in mind that the rules of court remain in
15    full force and effect and that means there is no
16    retransmission, streaming, taping, or other broadcast of
17    this proceeding.
18         Now with that said, would counsel identify
19    themselves and who they represent starting with Bio-Rad.
20         MR. REINES:  Thank you, your Honor.  This is
21    Edward Reines from Weil Gotshal on behalf of Bio-Rad,
22    and I'll let the other attorneys that are going to be
23    presenting today introduce themselves, so you know them
24    and see them, and the same with the Court Reporter.
25         THE COURT:  Thank you.
```

```
 1        MR. CONSTANT:  Your Honor, Justin Constant on
 2   behalf of Bio-Rad.
 3        MR. WALTER:  Your Honor, this is Derek Walter on
 4   behalf of Bio-Rad.
 5        MS. SAWYER:  And this is Audra Sawyer on behalf of
 6   Bio-Rad.
 7        MR. STEPHENS:  Good afternoon, your Honor, this is
 8   Garland Stephens on behalf of Bio-Rad.
 9        THE COURT:  Thank you.
10        All right.  And 10X?
11        MS. COLUMBIA:  Good afternoon, your Honor, this is
12   Sarah Columbia from the Boston office of McDermott.
13   Presenting today will be attorneys from the Tensegrity
14   Law Group, and I think Mr. Reines's idea was a good one,
15   so I will let them introduce themselves so you can see
16   them.  And we also have in attendance today, um,
17   Dr. Richard Fair, who is the expert witness who
18   submitted a declaration in connection with the markman
19   briefing.
20        THE COURT:  Thank you.
21        MR. POWERS:  Good afternoon, your Honor, this is
22   Matt Powers for 10X.
23        MS. HADZIMEHMEDOVIC:  Good afternoon, your Honor,
24   this is Azra Hadzimehmedovic on behalf of 10X.
25        MS. ROBINSON:  This is Jennifer Robinson for 10X.
```

1      MR. GERRITY:  Good afternoon, your Honor, this is
2  Robert Gerrity for 10X.
3      MR. EHRLICH:  Good afternoon, your Honor, Paul
4  Ehrlich for 10X.
5      THE COURT:  I didn't catch your last name?  I'm
6  sorry.
7      MR. EHRLICH:  Paul Ehrlich, your Honor.
8      THE COURT:  Ehrlich, yes.  Thank you.
9      MS. COLUMBIA:  And I should add, your Honor, we
10  have in attendance, um, the General Counsel for 10X,
11  which is Eric Whittacker, and in-house counsel, Randy
12  Wu.
13      THE COURT:  Thank you.
14      And for Stilla?
15      MS. RANKS:  Good afternoon, your Honor, this is
16  Liz Ranks from Fish & Richardson, and I'm going to let
17  my colleagues who are presenting today introduce
18  themselves as well.
19      THE COURT:  Surely.
20      MS. BROOKS:  Good afternoon, your Honor, Juanita
21  Brooks from Fish & Richardson on behalf of Stilla.
22      MS. WILLIAMS:  Nicole Williams at Fish &
23  Richardson on behalf of Stilla.
24      MS. WU:  Good afternoon, your Honor, this is Qiuyi
25  Wu from Fish & Richardson for Stilla.

1     MR. LAMARRE:  Good afternoon, your Honor, this is

2 Michael Lamarre from Fish & Richardson on behalf of

3 Stilla.

4     MS. REICHEL:  This is Whitney Reichel from Fish &

5 Richardson on behalf of Stilla.

6     THE COURT:  Thank you.

7     All right.  One housekeeping matter, and I think

8 Ms. Gaudet has told you.  We would like -- you've

9 delivered copies of these slides and the like.  I do

10 want those in electronic form.  You may already have

11 filed them.  But I'll need those for the Court Reporter

12 and the law clerks, because it's easier for them to work

13 with them in that form.

14     Now, I do have --

15     MR. TUTEUR:  Your Honor, may I interrupt for a

16 moment?  I'm sorry.  This is Michael Tuteur, we're here

17 for Harvard, who is also a party in this matter, and I

18 just wanted to make sure that the record didn't get too

19 far along before we identified ourselves for the record.

20 So it's Michael Tuteur from Foley & Lardner for the

21 President and Fellows of Harvard College, and my two

22 colleagues will introduce themselves as well.

23     THE COURT:  Thank you, Mr. Tuteur, and I did not

24 mean to skip over you.  I'm well aware that Harvard is a

25 party here.

1           Are you going to argue a position today?

2           MR. TUTEUR:  No, your Honor, but we'll be watching

3      with great interest.

4           THE COURT:  All right, I thank you.  And I'm happy

5      to meet your colleagues.

6           MR. RAUX:  Good afternoon, your Honor, Jeffrey

7      Raux from Foley & Lardner.

8           THE COURT:  Thank you.

9           MR. RODRIGUES:  Good afternoon, your Honor, Ruben

10     Rodrigues also from Foley & Lardner.

11          THE COURT:  Thank you.

12          MR. TUTEUR:  All set, your Honor.

13          THE COURT:  And I thank you very much.  Well I

14     thank you all, the briefing has been helpful and

15     thorough, and I really do appreciate your focusing on

16     what seemed to be significant issues.  And here's how I

17     propose to proceed now that I have read the briefs and

18     reflected on these matters, though you have much to

19     teach me.

20          In large measure, and this is too broad a brush,

21     but in large measure Bio-Rad says, "Well these things

22     have a plain and ordinary meaning," and the various

23     defendants say, "Well, no, they don't," um, and I think

24     we can best grapple with these if we at least start out

25     by discussing those where it occurs to me that the plain

1    and ordinary meaning perhaps does not work.

2         And so here's where I want to start, and it's in a

3    dispute that 10X focuses on, though I'll hear from

4    Stilla if they have an oar in this, um, and 10X, as to

5    the '444 patent, Claim 1, and the '277 patent, Claim 1,

6    argues for, um, that the claim term "ordering of method

7    steps" is something other than the plain and ordinary

8    meaning.

9         I have to say that it -- at least from the

10    briefing, it seems to me that 10X has the better of the

11    argument, but I propose something slightly different,

12    and I propose to, um, explain to the jury that -- and

13    now follow this language, "The claimed method steps must

14    be initiated in the listed order."  Not "performed," as

15    the defendants say, but "must be initiated in the listed

16    order."

17         Now we'll start with, um, Bio-Rad.  Isn't that an

18    accurate and explanatory, um, exposition of that claim

19    term?

20         MR. REINES:  Thank you, your Honor, and this is Ed

21    Reines from Weil on behalf of Bio-Rad, um, addressing

22    this term and the Court's good question.

23         I think in general that is acceptable because it

24    comports with the concept of potential simultaneity, um,

25    and let me just get another layer in, and the Court can

```
1    just stop me or pull me along, whatever you prefer.  But
2    is that -- you have this continuous droplet generator
3    that's just draining droplet after droplet in, and the
4    plurality to be any subset.  So these systems use
5    millions of them, right, there's millions of droplets,
6    there's certainly thousands in any kind of method.  And
7    so you might have a plurality for purposes of the claim
8    read -- that's just a plurality, let's just say of 10
9    for simplicity.  So within the million matter going, for
10   claim purposes you're looking at 10 of them as a
11   plurality.
12        It is certainly possible that you're creating 1
13   droplet and you'd create, let's say, 6 of the drops, and
14   they're starting to go into the pool, in the
15   microcapsule -- because there's no need for them to go
16   anywhere else, they come out of an orifice or whatever
17   and they go into, let's say into the pool, that 6 of
18   them could be there.  And so you've already begun the
19   pooling step, but that the droplet step is not complete
20   for that subset plurality of 10, um, until the 10th one
21   is completed.
22        So what the Court's saying is for that plurality,
23   um, it is conceivable that you could -- that it could be
24   required that you provide the droplet generator, okay
25   that happens, but --
```

1          THE COURT:  Well let me stop you only in this

2    sense.  What I'm groping for here -- the way we will do

3    this as a practical matter -- I mean my rulings, when I

4    make them on claim construction, may have pretrial

5    implications in terms of motions for summary judgment

6    and the like, but when we get to trial what's going to

7    happen is where I have, um, defined the term other than

8    plain and ordinary meaning, I'm going to give the jury a

9    glossary of each of those terms, and in my initial

10   charge to the jury I'm going to recite them, and the

11   Court Reporter will make a transcript of that and we

12   will give that to the jury so that they will be able to

13   look at it.

14          If you're okay with my formulation, that's fine

15   for the moment.  Certainly some of its implications, as

16   you explicate them, I understand and I'm familiar with.

17   I'm not saying I buy them all.

18          So what does 10X say?  I go for your proposal but

19   I want to substitute "initiated" for "performed."  How

20   do you go -- what do you say to that?

21          And let me make a side comment.  We're all in our

22   several offices and the like.  I wouldn't do this if I

23   was on the bench, but I drink tea, and I'm going to

24   drink my tea as we talk together.  Don't take that as

25   any sign of disrespect and feel free to drink any

1   nonalcoholic beverage.

2        What does 10X have to say?

3        MR. POWERS:  Thank you, your Honor.  I think, your

4   Honor --

5        (Interruption by Court Reporter.)

6        MR. POWERS:  This is Matt Powers for 10X.

7        THE COURT:  Yes.  And the Court Reporter -- this

8   is difficult for the Court Reporter and if you'd do this

9   as we go along.

10        Go ahead, Mr. Powers.

11        MR. POWERS:  Thank you, your Honor.

12        I think your proposed revision captures in part

13   what we think is the right answer and I want to make

14   very clear what our position is and is not.  Our

15   position is not that if you are making a million

16   droplets, that all million droplets must be made before

17   a single droplet is pooled, which is the next step, and

18   our position is not that the entire million droplets

19   must be pooled before you conduct a reaction.

20        What our position -- that is not our position,

21   although Bio-Rad is -- I think it's implied that it is,

22   because the claim doesn't say that the entirety of the

23   production of droplets must be performed and completed.

24        THE COURT:  But "initiated" would leave that open?

25        MR. POWERS:  "Initiated" leaves that open, but it

1    leaves an ambiguity in one important respect, your

2    Honor, and that important respect is -- I think it may

3    help illustrate the argument if you look at our Slide

4    A-8, which has the claim --

5         THE COURT:  I've got everything here, you just

6    have to give me a moment.

7         MR. POWERS:  Certainly, your Honor.  It's Slide

8    A-8, which is -- which is the order-of-steps decl.

9         (Pause.)

10        THE COURT:  I have it.

11        MR. POWERS:  Bio-Rad's patent counsel chose to use

12   a very specific form of claim which involves antecedent

13   basis claiming about deplurality of droplets -- that

14   they use the term "microcapsules," but we've been using

15   the word "droplets," and I think for our purposes that's

16   equivalent for this discussion.  And A-8 walks through

17   the steps and highlights the antecedent language used,

18   which is a very specific form of claim drafting that has

19   particular and distinct effects.

20        The first step is to provide a plurality of

21   droplets, that's those aqueous microcapsules.  Now we're

22   not saying that that plurality has to be all new, but it

23   does have to be a plurality, two of them, whatever that

24   number is.  But the important part of the claim

25   structure, if you go to the following three steps, it's

1   always "pooling the microcapsules," which is an

2   antecedent basis for the ones that were provided in Step

3   1, "such that a portion of the plurality" -- that's the

4   same plurality, it's not just any number, it's the same

5   plurality, and that particular form of claim drafting

6   has a consequence, because that means you have to be

7   doing, operating on that plurality in Step 2.  So it's

8   not just operating on some capsule, it's the same

9   plurality that you made in Step 1.

10       So while your Honor is absolutely right that they

11  are initiated in order and the steps need not be

12  completed for purposes of the process you're running --

13  in other words not all million droplets need to have

14  been formed, for purposes of the claim the plurality of

15  droplets has to be first formed, whatever that plurality

16  is, and then that plurality has to be pooled into the

17  separate compartments.  And in the third step, that same

18  plurality within the compartments -- so it has to have

19  existed beforehand, they're conducting a reaction on

20  that very same plurality.  And in the fourth, you're

21  detecting the product of the enzymatic reactions.

22       You have a -- as I say, a very specific form of

23  claim drafting that was chosen, which has the

24  consequence that that same plurality has to be tracked

25  all the way through the claim.

1          So while your Honor is exactly right that they are

2     initiated in that sequence and that in a process/flow

3     sense they need not be completely performed, that

4     plurality has to be performed in Step 1 before it can be

5     acted on in Step 2.

6          THE COURT:  Well I'll react to what you say by

7     saying I follow that and that's how I read this English

8     language, but I say that's plain and ordinary.  So I

9     don't have to say any more than what I propose.  And I

10    think I'm going to stick with what I do propose.

11         MR. POWERS:  May I comment on that, your Honor?

12         THE COURT:  Yes.

13         MR. POWERS:  The -- as long as it's clear that you

14    agree with what I'm saying and I think --

15         THE COURT:  Well you know I agree with what you're

16    saying until someone persuades me that that's wrong.

17    That's how I read the language.  But I can only deal

18    with what I'm going to say to the jury here, that's what

19    the exercise is, and I don't propose to say all that to

20    the jury.

21         MR. POWERS:  You did --

22         THE COURT:  I say it and I'm not going to say it.

23         MR. REINES:  Your Honor, this is Ed Reines, can I

24    respond?  Because I think we're joining it up and

25    narrowing the issue in a helpful way.

1          THE COURT:  Yes.  Yes.

2          MR. REINES:  So I think we're all in agreement

3     that when you apply this claim to a method, you're not

4     applying it to all million -- that's a point of

5     agreement, not disagreement between Bio-Rad and 10X, um,

6     but that when you apply for that plurality, the point is

7     that your Honor's correct in the language -- and I think

8     Mr. Powers is actually disagreeing with your Honor, that

9     the change that you're making is the change he doesn't

10    want made.  His position is that the method only covers

11    the plurality and that all of Step 1 has to be complete

12    before Step 2 goes forward, and so on and so forth, and

13    I don't believe that that's correct.

14         THE COURT:  But he didn't say that.  He didn't say

15    that.  He's talking, as I follow him, um, if we look at

16    his slide here, A-8, the use of the -- in the second

17    phrase there, "pooling the microcapsules," that's -- as

18    I read the English language, that's the, um, what's

19    produced in Step 1.  It's not something else.  And the

20    use of that same article, as we go through, does, as I

21    read it, mean we trace through what we're doing here in

22    these various steps.

23         MR. REINES:  Your Honor, there's no question about

24    that, but the point where we're all joined up, and we

25    can join it up right now as to what the disputed issue

1    is, um, is that, for example, if your plurality is 10

2    drops, it's going to be a plurality, it's going to be

3    more than 2, everyone agrees it's not a million, it

4    doesn't need to be, but if it's 10, that if the droplet

5    generator is dropping the droplet into the common

6    compartment to create a pool of them, the first 5 will

7    be part of that pool.  So the second step will be

8    "initiated," to use the Court's intelligent term, but

9    yet the first step won't be complete because the last 5

10   haven't even been necessarily generated.

11       And then it goes to whether providing a droplet

12   generator is actually making the droplets, which it's

13   likely not, but let's just say that it was for purposes

14   of this discussion.  So if you have 5 droplets that are

15   generated, 1, 2, 3, 4, 5, and they were placed into the

16   common compartment, they're already being pooled.  The

17   first five haven't been generated yet, so that

18   generation step hasn't happened.

19       And then the point that Mr. Powers really put his

20   weight on, "such that a portion of the plurality of the

21   microcapsules contact each other," that's a portion of

22   the plurality.  That reinforces our position that it's

23   not all of them that need to be in there.  So it could

24   that you're creating the pool, and in the process of

25   creating the pool, you're providing a droplet generator.

1   And so on and so forth.  So it can begin to act on the

2   next one.

3        And what I would say, just as a cap on this, your

4   Honor, is that the **Kaneka** case is right on point.  If

5   you read one case, it's that case.  And in **Kaneka** it's

6   exactly like this where it's one step, the step is

7   oxidation, and then, um, there has to be another active

8   step on it.  And what the Court said there is exactly

9   what your Honor said -- honestly, exactly, which is it

10  has to be initiated in the sequence, but it doesn't have

11  to be completed, in other words oxidation doesn't have

12  to be absolutely completed before the next process

13  starts, it just said "oxidation," then the next point.

14       THE COURT:  Well this is a work in progress in the

15  sense that what I'm doing this afternoon, and for

16  however long it takes us, is, um, trying to construe

17  these claims.  Now once we get done that, um, at least

18  that will be my construction and we'll see what

19  implications that has.  But for now we're going to

20  adopt, as to the first of the two disputes, um, my

21  formulation, "The claim method steps must be initiated

22  in the listed order."

23       Now I want to skip then to, um, this -- the third

24  issue, um, where, um, we have -- we're talking about, in

25  Patent Number '277, Claim 3, and, um, the claim term is

1    "primers for a polymerase chain reaction."  And the

2    choice that I'm given here is Bio-Rad says "plain and

3    ordinary meaning" and, um, 10X gives me a definition.

4         Now 10X's definition is a definition that finds

5    support in the literature, um, but at least as I read

6    your briefs and reflect on them, that may not be the

7    only, um, way to do it.  And the fact that Bio-Rad's

8    teaching in its specifications teaches that way doesn't

9    narrow its claim to that specific way.  But I feel that

10   I have to do something more on this disputed issue than

11   simply say, in this extraordinarily complex area, "Well

12   this is the plain and ordinary meaning," because we're

13   going to be in front of the jury battling over what the

14   plain and ordinary meaning is.  And that is, um, while I

15   hesitate to say it's a matter of law, I've always had

16   trouble with the jurisprudence in this area, but, um, to

17   say it straight out, what I'd like from Bio-Rad is how

18   broadly do you claim here is "plain and ordinary

19   meaning"?  These are technical terms.  I'd like a

20   preferred definition as broad as you think the patent

21   office gave you in this claim and then that's something

22   we can argue about.

23        Am I making any sense to you in what I'm asking

24   about, Mr. Reines?

25        MR. REINES:  Yes, your Honor, and I do have this

```
1    term.  You're making a lot of sense.  And let me just
2    say three things about that.
3          One is that the 10X-proposed construction does
4    not, among other things, achieve the jury-friendly, um,
5    nature.  I mean "oligonucleotide" is even more of a
6    tongue-twister than the phrase itself.
7          Second of all, and this is a point, you know, I --
8    I think you've been a leader in jurisprudence in this
9    area, as you know.
10         THE COURT:  Well, no, I don't know that and that
11   will get you nowhere.
12         (Laughs.)
13         THE COURT:  But look --
14         MR. REINES:  Well --
15         THE COURT:  It's not so much I want you to attack
16   theirs, I want to know what the problem with theirs is.
17   Arguably it may narrow your claim.  I know I can't do
18   that.  But I'm not clear or sufficiently clear as to
19   what this claim is or how far it goes or --
20         MR. REINES:  Precisely.  So what I'm saying
21   wasn't shining your shoes, what I was saying is that
22   your Honor's pointed out that sometimes you're
23   construing these things in the abstract in a claims
24   dispute that is never going to happen, and you have been
25   a leader in that, and the point I want to make on this
```

1    issue is that the particular PCR processes are debatable

2    -- or what's debated as PCR processes that come up at

3    trial is not going to be -- we don't have to take on the

4    universe of this ubiquitous term, we'll have a specific

5    process and then the parties can debate whether

6    "polymerase chain reaction" -- the jury's not going to

7    be on its own, each side gets an expert, and so trying

8    to like come up with, you know, an omnipurpose

9    construction.

10           But what I would say, just to underline your

11   Honor's concerns about this, is on Page 15 of the

12   responsive brief -- this is Document 149 of 10X, they

13   say, "If the applicants wanted to describe reactions

14   like, um, RT-PCR or Random-PCR that were well-known,

15   applicants could have included those techniques in the

16   specifications."

17           So they're acknowledging that there are other PCR

18   techniques that they're trying to exclude, including

19   Random-PCR, um, which you know indicates that Random-PCR

20   -- you're not necessarily -- you're using random

21   primers, so you're not bracketing a known sequence, so

22   it wouldn't fit within -- at least arguably within their

23   construction.  So they're acknowledging that they're

24   trying to keep PCR processes out.

25           I don't know that I can come up with, um -- I know

1  I'm not technically skilled enough to come up with every

2  PCR reaction to my --

3      THE COURT:  Let me say it back to you.  Let me say

4  it back to you.

5      What you propose -- because I'm not hesitant to

6  discharge my function, as I understand markman, I'll

7  construe the patent, but you're saying to me, "Well

8  their construction is too narrow, um, in essence don't

9  venture a construction now, when you see the dispute

10  about this polymerase chain reaction, you'll be in a

11  position to rule what's within the claim and what is

12  not."

13      Have I captured what you're saying?

14      MR. REINES:  Largely, although you may determine

15  that it's a Step 2 infringement question at the end of

16  the day, but, yes.  That other than that, I agree with

17  you totally.

18      THE COURT:  All right.

19      10X, what do you say about that, that I ought just

20  let that lie for now?

21      MS. HADZIMEHMEDOVIC:  Your Honor, this is Azra

22  Hadzimehmedovic on behalf of 10X.

23      THE COURT:  Yes.

24      MS. HADZIMEHMEDOVIC:  Your Honor, we believe that

25  your Honor's initial inclination to actually construe

1    the term is appropriate.  Whenever PCR would be --

2    before these parties PCR was construed, and this term is

3    even more complicated, it is "primers for PCR."  It is

4    these types of technical terms that truly are amenable

5    to construction because the jury needs to be helped in

6    understanding why that is.

7            THE COURT:  No, but your problem is, and it's one

8    that occurs in patent law, that what they've taught in

9    their specification -- which you seem, as I can make

10   sense of it, to have grabbed onto in your proposed

11   construction, doesn't cover the field, and their claim,

12   by its terms, is broader than that, and it would be

13   legal error to limit them to what's taught in the

14   specification.  That's all I'm saying.

15           MS. HADZIMEHMEDOVIC:  Two responses to that, your

16   Honor.  One has to do with the structure of the claim as

17   they issued, as the named inventors intended it to be,

18   and if you could, your Honor, um -- this set of slides

19   is called "B" set of slides in the binder you have.  If

20   you could please turn to Slide B-44 and I will cover

21   B-44 and B-45.

22           (Turns.)

23           THE COURT:  I have it.

24           MS. HADZIMEHMEDOVIC:  In these, when Harvard and

25   MIT and the named inventors meant to cover this field,

cover broader than just the PCR, they said that.  In

Claim 1, they covered enzymatic reactions.  In Claim 2

they covered amplification reactions.  These additional

types of reactions that Bio-Rad is trying to put into a

dependent claim, Claim 3, are amplification reactions,

they're not the PCR reaction that Bio-Rad, Harvard, and

MIT claimed in Claim 3.

Claim 3 is narrow, it is "primers," plural, "for a

delivery chain reaction PCR."  And Part 2 of that -- and

the meaning is you cannot now be reading this narrow

Claim 3 to be broader and somehow co-extensive with the

broader claims.  They got the broader claims, they

should keep those, but they should not be trying to

expand and broaden a claim that is narrow, "primers for

a preliminary chain reaction PCR."

The second point that is extremely important in

this context is one is bound by the record.  The record

here is the intrinsic record and our definition is

exactly from the intrinsic record.  And we have slides

on that and we can move on.

THE COURT:  Well, no, it's from the

specifications?

MS. HADZIMEHMEDOVIC:  It is from the

specifications, from the second -- from the section of

the specification called "definitions."

1          In that section, on Claim 20, it says "polymerase

2     chain reaction," parentheses, "(PCR)," as it does here,

3     and then it says "Saiki 1988."  "Saiki 1988" is an

4     article famous in the field -- I think we all agree on

5     that, it was Kary Mullis who invented PCR, who invented

6     this PCR they're claiming in Claim 3.

7          "Saiki" is an article that is in that definitional

8     part of the specification and we took our definition

9     verbatim from "Saiki."  Saiki's part of the intrinsic

10    record both because it's cited there in the definition

11    and also because this patent, the '277 patent, says,

12    "I'm incorporating these articles into my

13    specification."

14         So the record is clear and they have, in other

15    sections of the specifications, lists of amplification

16    reactions.  Those amplifications reactions and these

17    that are not even mentioned anywhere -- Random-PCR,

18    whatever that may be, or RT-PCR, though reactions may be

19    in these broader claims, but they're not, not in the

20    claim --

21         THE COURT:  Well help me out here.  Are you

22    arguing that given the patents that we have here, that

23    we're talking about, when they talk about "Polymerase

24    Chain Reaction," the "PCR," there's only one way to

25    accomplish that reaction?  That's not so, is it?

1      MS. HADZIMEHMEDOVIC:  The way this patent '277 is

2   written, it is defining the "PCR" as what everybody in

3   the world knew and knows now is "PCR."  The Mullis PCR

4   -- he got a Nobel prize award for it, and everybody

5   knows that it is a three-step process, everybody knows

6   that the parts of our construction are actually faithful

7   to that PCR.

8      The other types of PCR -- um, whatever Random-PCR

9   may be, is an amplification reaction and they do have

10   claims on amplification reactions.  This claim is for

11   PCR as defined in this patent to be Saiki PCR, Mullis

12   PCR.

13      THE COURT:  Just so I am sure I understand your

14   argument and you make it very well.  You're saying that

15   to one skilled in the art, when they use the term -- and

16   they get to draft the patent, when they use the term

17   "Polymerase Chain Reaction," the use of that term meant

18   this Saiki approach, and that one skilled in the art

19   would think of this -- what I have inartfully called

20   "another method," as an amplification reaction.  Is that

21   correct?

22      MS. HADZIMEHMEDOVIC:  That's exactly right, your

23   Honor.

24      THE COURT:  All right.

25      MS. HADZIMEHMEDOVIC:  And we have one of ordinary

1  skill in the art, Dr. Fair, who has confirmed that.

2  And --

3       THE COURT:  Well let's see what Bio-Rad says to

4  that.

5       MR. REINES:  Yes, your Honor.

6       First of all, I want to -- I'd say two things.

7  It's acknowledged that there's PCR that they're

8  excluding, Random-PCR is just one example.  So PCR is

9  PCR, I just -- I don't think there's any basis to say

10 that it wouldn't encompass these other types of PCR

11 they're trying to exclude.  But there has been no

12 identification that I see of a definition that would

13 disclaim -- because here the argument is "Yes, there's

14 other types of PCR," but that's not what this is, this

15 is a special safety type.  There is no explicit or

16 expressed disclaimer rising, you know, to a clear

17 disvowel, nor have they argued until, I guess, now it's

18 been suggested.  I just don't think this specification

19 meets the standard to, um, to constitute, um, that kind

20 of definition that's excluding, you know, things that

21 everyone agrees are PCR.

22      THE COURT:  All right.  I'll take the matter under

23 advisement and I thank you.

24      Let's look at the phrase "plurality of species,"

25 that's in Patent '085, Claims 1, 3, 11, and 18.

```
 1              Now the actual claim term is, um, it has two words
 2      in it.  "Plurality" or "plurality of" I think can be --
 3      the plain and ordinary meaning will take care of that.
 4      In the terms of this patent, the '085 patent, I propose
 5      that "A species" -- um, I don't -- I'm a little closer
 6      to the defendant's approach here, um, in fact I'm with
 7      the defendant's approach.  "A species is any substance
 8      that can be differentiated from the droplet fluid."
 9              What's the matter with that?  And we'll ask
10      Bio-Rad to tell me what's wrong with it.
11              MR. CONSTANT:  Your Honor, Justin Constant, for
12      Bio-Rad.
13              THE COURT:  Yes.
14              MR. CONSTANT:  Well, your Honor, the problem is
15      that if a species -- if a plurality of species can
16      simply be just any two substances differentiated from
17      the droplet fluid, it effectively takes all meaning from
18      the addition to the claim.  And I'd like to point or
19      look to the file history and give you a little history
20      of how this specific element was added to the claim.
21      And if you would turn to Bio-Rad's Slide 48.  Um --
22              THE COURT:  Wait a minute.  (Turns.)
23              (Phone rings.)
24              THE COURT:  Just a moment.
25              (Pause.)
```

1          THE COURT:  Yes, 48.  I have it.

2          MR. CONSTANT:  So, your Honor, in response to a

3   rejection from the examiner over a combination of a few

4   references, the applicant added in specific limitations

5   -- and as you can see in Slide 48, um, this particular

6   addition was for this claim term, "plurality of."  And

7   the reason they added that, um -- and one of the

8   distinguishments was that, um, Trnovsky had taught that

9   it was desirable to make sure that all of the droplets

10  only contained 0 or 1 chromosomes.  So in other words,

11  the addition of a plurality would get around that

12  because it would require, um, multiple species instead

13  of just this, the single chromosome.

14          Now that argument makes little sense in light of

15  this construction where a species can simply be any

16  substance, because a chromosome itself consists of many

17  many many thousands -- or rather tens or hundreds of

18  millions of base pairs.  So in that sense this

19  distinguishment, this amendment to the claims, wouldn't

20  give, um, any sort of, um, separation from the claim

21  references.  So in other words, the addition of

22  "plurality of species" has to mean something more than

23  just any two individual substances.

24          Now, Bio-Rad doesn't disagree that the term

25  "species" on its own --

1        THE COURT:  I'm not sure I understand the

2    language.  The slide is helpful.  But if we adopted

3    their and, for the moment, my proposed definition, if a

4    "species" -- if a "species" is a substance that's

5    differentiated from the droplet fluid, the language here

6    is modified, um, by -- we're talking about the current

7    meaning, wherein "the plurality of species are nucleic

8    acids."  So, um, I don't see -- I don't see where you're

9    going with that?  It doesn't drain it of meaning, it

10   says, "Well anything that's different than the droplet

11   fluid is a species," but, um, we're talking about the

12   plurality being nucleic acids and the rest of the

13   language there.

14       Do I grasp the meaning?

15       MR. CONSTANT:  So, your Honor, I think you're

16   correct in one way, but as far as these dependent claims

17   are going to actually support Bio-Rad's position,

18   because when they're discussing the groupings, the

19   plurality of species as a group, they're referring to it

20   with a singular characteristic.

21       So in Claim 3, for example, they refer to them as

22   the nucleic acid.  So in other words, you know, it's the

23   individual species needs to be nucleic acid.  And the

24   same applies for nucleitides, that each one of these

25   different species would have to be polynucleitized.

1          THE COURT:  Well in what you've shown me, they

2     don't all have to be, a plurality of them have to be.

3     So that means, um, whatever's the opposite of

4     "plurality," a "minority," can be something else.  So

5     I'm -- I'm not sure how -- it just seems logical to say

6     a "species," as it's used here, is something different

7     than the droplet.

8          MR. CONSTANT:  And, yes, your Honor, I don't think

9     we necessarily disagree with that.  I think the addition

10    of "plurality of species," as used as a -- as the term

11    as it's used in the claims, um, connotes some additional

12    meaning, and that additional meaning --

13         THE COURT:  It means -- it means the plain and

14    ordinary meaning.  It means -- I don't mean to be too

15    simplistic because these may be terms of art, but it

16    means most of them have these other characteristics,

17    nucleic acids, etc.

18         MR. CONSTANT:  Um --

19         THE COURT:  I give you that.  I mean the plain and

20    ordinary meaning of "plurality" is the majority, um,

21    most of them.

22         MR. CONSTANT:  Well, your Honor, in -- and I do

23    agree with you that in this case I think the plurality

24    isn't necessarily talking about like a larger subset,

25    it's that there's just more than one species.  But I

1    believe when used in connection -- and as a whole term

2    "the plurality of the species," it -- and in view of how

3    it was argued in the file history, um, and specifically

4    looking at the Slide 49 --

5         (Pause.)

6         THE COURT:  All right.

7         MR. CONSTANT:  And so these were statements made

8    by the applicant to the patent office and this was

9    submitted along with those amended claims.  And as you

10   can see, Trnovsky was being distinguished because it

11   only taught that the droplets had to have 0 or 1

12   chromosomes, instead of, rather, a plurality of

13   chromosomes.

14        (Pause.)

15        THE COURT:  Well I haven't got the whole reference

16   here.  I don't -- that doesn't leap out at me, I have to

17   say.  Let's look at the first sentence.

18        (Reads.)

19        THE COURT:  Here's what I get from this paragraph

20   that you have, um, highlighted here.  That what's

21   different from Trnovsky here is that the amended claims,

22   um, teach that the droplets have a plurality of species

23   of "nucleic acid" or, as set out in 25, or "primers," as

24   set out in 52.  So I was too simplistic to start talking

25   about a majority or most of them, rather it is that

1    there are, um, a sufficient quantity of, um, a

2    particular type of species in Claim 25, "nucleic acids,"

3    and in Claim 52, "primers."

4         Does that get the idea?

5         MR. CONSTANT:  I believe so, your Honor.

6         THE COURT:  So if that gets the idea, I still

7    don't see what's the matter with -- what you've done is

8    taught me, um, a nuance of the word "plurality," which I

9    was saying "Oh, ordinary meaning," but I guess I didn't

10   understand it, but "species" can properly be defined as

11   something different than the droplet.

12        MR. CONSTANT:  Well, your Honor, yeah, in -- and I

13   believe that -- again an individual species -- and as

14   it's used in the specification it can be anything that's

15   differentiated from the droplet, but when you refer to a

16   "plurality of species," there needs to be some

17   connection between these different species.

18        THE COURT:  Well I agree that there does.  So what

19   language do you propose?

20        MR. CONSTANT:  Well, your Honor, that's, um -- so

21   our construction is just that, it's that there is some

22   connection between these various species.  So "multiple

23   unique members of a common genus that are characterized

24   by some unifying property."

25        THE COURT:  Well that sounds pretty complex, can't

1   we be simpler than that?

2        MR. CONSTANT:  Well, your Honor, I think we may --

3   in this particular instance I think, you know, we may be

4   okay with -- or Bio-Rad would be fine for a plain or

5   ordinary meaning, or that if this does, um, come up,

6   like we discussed, with a previous term in the context

7   of a summary judgment, that may make sense.  But --

8        THE COURT:  Fine, it may -- again I don't mean to

9   be simplistic, though I'm a simplistic thinker.  I was

10  in error and you've made it clear and I appreciate it.

11  "Plurality" in this sense does not mean "majority" in

12  any way, but what it does mean is a "bunch of them."  It

13  doesn't just mean a random one around there, it means a

14  "bunch of them."  A "bunch of them," given the claim,

15  are nucleic acids, or in Claim 52, a "bunch of them" are

16  primers.  And that's what you're looking for.  A "bunch

17  of them" may be too, um, downscale for our elite

18  profession, but, um, that's what I'm thinking about, and

19  we'll grapple with it.  And I think I have the idea.

20  All right.  Thank you.

21       Let's go on then.  Well really I think that pretty

22  much does it for 10X.  Let's turn to Stilla here.

23       Now, um --

24       MR. EHRLICH:  Your Honor, before we proceed to

25  Stilla -- and this is Paul Ehrlich.

1              THE COURT:  Yes, Mr. Ehrlich.

2              MR. EHRLICH:  There was one more joined dispute in

3      the briefing between 10X and Bio-Rad, um, the terms --

4      "including label or tag" and, um, we just wanted to know

5      whether you wanted to hear oral argument on that term?

6              THE COURT:  I do not.  But I thank you very much.

7              All right, now let's turn to Stilla.  And in

8      Stilla, um, here we have, um -- again my instinct is to,

9      um -- except for the ones that we're going to talk about

10     now where Bio-Rad says plain and ordinary meaning will

11     do it, I think that's correct, except as we talk about

12     the following.

13             I'm now talking about, um, the '310 patent, Claims

14     1, 15, and 27.  I -- um, don't go entirely for Stilla's

15     meaning, but I propose -- I propose this meaning.  A, um

16     -- where the phrase "a plurality of different primer

17     types" appears there, it seems to me that means "more

18     than one set of different primers of primer pairs each

19     set," and going on from there.

20             Do you follow the language as I've spelled it out?

21     What's the matter with that?  And we'll turn to, um --

22     well that -- neither one has proposed that, so we'll

23     turn to Bio-Rad to start with that.  I propose that "a

24     plurality of different primer types" means "more than

25     one set of different primers or primer pairs, each set,"

1    and so on.

2         MS. SAWYER:  Your Honor, this is Audra Sawyer for

3    Bio-Rad.

4         THE COURT:  Yes, Ms. Sawyer.

5         MS. SAWYER:  So I think the key issue with this

6    construction is going to be that primer pairs aren't

7    necessary to conduct PCR, so our main issue with

8    Stilla's construction, and I think it also comes up here

9    as well, is that we don't believe that primers should be

10   limited to pairs.

11        Unless I misheard you?

12        THE COURT:  I think maybe you did, and I think

13   you'll be more comfortable.

14        I propose to define "a plurality of different

15   primer types" as "more than one set of different primers

16   or primary pairs, each set," et cetera.

17        You're okay with that?

18        MS. SAWYER:  Yes, I apologize.  I --

19        THE COURT:  Oh, no, your saying you're okay with

20   it is fine by me.

21        What does Stilla say?  Doesn't that work?

22        MS. BROOKS:  Yes, your Honor.  Juanita Brooks on

23   behalf of Stilla.  And we would agree, it does work.

24        THE COURT:  Fine.  Well good.

25        Then let's go on to, um, this, um, this one.  I'm

```
 1    in the '993 -- the '933 patent, excuse me, Claim 1.
 2    "Forming a plurality of droplets of the aqueous fluid in
 3    the immiscible carrier fluid."  And, um, here Bio-Rad
 4    says plain and ordinary meaning.  Again I don't, um,
 5    necessarily agree with Stilla, but I propose the
 6    following.  So let's be very careful with what I'm
 7    saying.
 8         I propose this language:  "Forming a plurality of
 9    droplets of the aqueous fluid by introducing a stream of
10    the aqueous fluid into the flow of an immiscible carrier
11    fluid."  I'll say it again.  "Forming a plurality of
12    droplets of the aqueous fluid by introducing a stream of
13    the aqueous fluid into a flow of the immiscible carrier
14    fluid."  That's not a plain and ordinary meaning and
15    it's not what Stilla has proposed, so I'll hear either
16    one of you.
17         MR. WALTER:  Your Honor, this is Derek Walter for
18    Bio-Rad.
19         THE COURT:  Yes, Mr. Walter.  Okay with that?
20         MR. WALTER:  Well, no, I think we would propose a
21    slight modification.  How about "Forming a plurality of
22    volume of aqueous fluid" --
23         THE COURT:  "Forming a plurality of" --
24         MR. WALTER:  -- "of volumes of aqueous fluid by
25    introducing a stream of the aqueous fluid into the
```

1    immiscible carrier fluid"?  I think the trouble we have

2    with your proposal is this language of "flow."  There's

3    no requirement that the carrier --

4         THE COURT:  Oh, I see, you talk about volumes, but

5    let me try -- well let's see.

6         MR. WALTER:  Sure.

7         THE COURT:  I think what you're saying is "Forming

8    a plurality of droplets of the aqueous fluid by

9    introducing a stream of the aqueous fluid" -- and go

10   from there?

11        MR. WALTER:  -- "into the immiscible carrier

12   fluid."

13        THE COURT:  Okay, and I had "into a flow of an

14   immiscible carrier fluid."  All right.

15        And tell me why yours is better?

16        MR. WALTER:  Ours is better because it's much more

17   consistent with the claim language, the specification,

18   and just the intrinsic record overall.

19        This notion of having two flows interact with one

20   another, um, that, um, is a claim term that's -- that's

21   a conduct that's associated with a term called "plug."

22        Now, um, if you can look at our slide

23   presentation, Slide 93.

24        (Pause.)

25        THE COURT:  I have it.

1          MR. WALTER:  Now, the term "plug" in the patents

2     en suit is a defined term, okay, and that defined term,

3     um, refers to a type of droplet that's made by a

4     technique where you have two flows, where you have a

5     flow of the carrier fluid and you have a flow of the

6     acqueous fluid, and you can see that right there where

7     it talks about "a stream of at least one plug fluid

8     introducing to the flow of the carrier fluid."  That's a

9     defined term in the patent, the term "plug."

10          This patent doesn't use the term "plug," it uses

11     the term "droplet."  So your proposed definition would

12     limit the patent to the term "plug" when it doesn't use

13     that term.

14          And that's an important point, because if you look

15     at the next slide, Slide 94.

16          THE COURT:  Wait a minute.  Is "plug" defined in

17     this patent, the one we're talking about?

18          MR. WALTER:  Yes, "plug" is a defined term in this

19     patent.

20          THE COURT:  Oh, yes, I see it.  Yes.

21          MR. WALTER:  And your construction would have the

22     effect of limiting the patent to "plugs" when the claims

23     don't use that term.

24          THE COURT:  All right.

25          MR. WALTER:  And that's an important point.  You

```
 1   know the patentee could have limited it to "plugs," but
 2   they didn't use the term because they didn't want to
 3   limit it to "plugs."  They used "droplets."
 4        THE COURT:  I understand.  I understand the
 5   concept.
 6        What does Skilla say?
 7        MR. WALTER:  And if you look at the next slide,
 8   Slide 94, we know that the term "droplets" is broader
 9   than "plugs," we know that the term "droplets"
10   encompasses ways of making, um, volumes of fluid where
11   you don't have intersecting flows, and we know that from
12   their own experts.  This is Page 30, Paragraphs 33 and
13   34 of their expert.
14        Here he's talking about different ways you can
15   make droplets that were known.  In Paragraph 33 he talks
16   about one way where you make a microjet coming out of a
17   capillary tube.  And in Slide 34 he says that another
18   way you can do it is where you have the intersecting
19   flows, okay, and -- so the point, the term "droplet" is
20   broader than what your construction originally was,
21   that's just known to someone skilled in the art, and
22   your construction will have the effect of limiting it to
23   the, um, to the, um, the defined term in the patent
24   that's not used in the claims.
25        THE COURT:  I understand the argument.
```

1      MR. WALTER:  And I can -- I have other reasons as

2  well, I mean if you'd like me to keep going, I can.

3      THE COURT:  I'm not saying you've swept the field,

4  but I certainly understand your argument.

5      What does Stilla say?

6      MS. WILLIAMS:  Your Honor, Nicole Williams on

7  behalf of Stilla.

8      What's important to note here is that the

9  University of Chicago, which is the patent owner for the

10  '933, has limited or says that droplets and plugs are

11  the same thing, and, um, this is not only the consistent

12  use of the term "plug" in the specification and not the

13  use of the term "droplet," but also is what the

14  University of Chicago has said directly to the patent

15  office about this specification, about this common

16  specification.

17      So if you have our slide in front of you, you can

18  look at just one example of this.  On Slide 52.

19  Actually let's step back, let's start with Slide 51.

20      The provisional applications themselves, um, that

21  the '933 was based upon used "droplet" and "plug"

22  interchangeably and in fact say the term "plug" refers

23  to the droplets.  They're telling the patent office,

24  "Look, 'plug' may not be a term that they're used to,

25  you understand 'droplets, they're the same thing."

1    And again, um, in the '544 provisional, um, "the

2    streams enter a microchannel with flowing oil at which

3    point droplet," and then in parentheses, "plug," "form

4    every agent come in contact."  So that's directly out of

5    the provisional application.

6    And then beyond that, University of Chicago has

7    taken this same specification and told the patent

8    office, on six separate occasions, that, um -- and on

9    Slide 52 you can see this language, "The inventions of

10    the Ismagilov patents are based on the use of microfluid

11    droplets which are referred to in these Ismagilov

12    patents as 'plugs.'"

13    So this idea that now the University of Chicago is

14    saying "Oh, no, 'droplets' and 'plugs' are two different

15    things and let's imbue more breathe to the term

16    "droplets" than is to "plugs," goes directly against

17    what they told the patent office and what the basis for

18    the term "droplets" and "plugs" is.

19    And finally, I know we would agree with your

20    Honor's construction of the term.

21    THE COURT:  All right.  Good.

22    All right, I propose to take that under

23    advisement.

24    Now, um, in all other respects, um, with these

25    disputes, I propose to, um, apply the plain and ordinary

1   meaning of the disputed terms, which I believe I can

2   grasp and, um, I believe I can either have explained to

3   the jury or will explain to the jury.  Not everyone

4   agrees and I will hear you now, if you wish.  I do

5   propose to write up at least these matters that I've

6   taken under advisement and we'll go from there.

7        I have not forgotten your discovery disputes.  I'm

8   working on it.  You'll all get my instructions.

9        Anything else to be done this afternoon?  This has

10  been extraordinarily helpful, I must tell you.  You

11  people are right on the mark.  It's a great pleasure to

12  working with you.

13       Anything else to be said this afternoon?

14       MS. BROOKS:  Yes, your Honor, with the Court's

15  permission.  Juanita Brooks on behalf of Stilla.

16       THE COURT:  Yes.

17       MS. BROOKS:  Going back to the '310 patents, your

18  Honor.

19       THE COURT:  Yes.

20       MS. BROOKS:  Bio-Rad has asked for the plain and

21  ordinary meaning for the term, Claim 1, of "providing a

22  plurality of partitions," which were later amended to

23  mean "droplets, each comprising a nucleic acid molecule"

24  --

25       THE COURT:  I have read it.

1          MS. BROOKS:  And a similar term appears in Claim

2     15, "amplifying the single target sequence term, a

3     nucleic asset molecule, in the droplet."

4          THE COURT:  Right.

5          MS. BROOKS:  And if your Honor goes to our slide

6     decl, which is still a slide decl at page, um, Slide 20.

7     What we here, your Honor, is -- we're not saying that

8     there might not be a plain and ordinary meaning to this

9     term, what we are saying is that Bio-Rad, um, in order

10    to get around rejection over the prior art, disclaimed

11    the plain and ordinary meaning, and was very specific

12    about it.

13         So if we look at Slide 20 -- and this is Bio-Rad

14    responding to the patent office rejection, and talking

15    about the prior art, and talking about in the prior art

16    "when amplifying several nucleic acid templates

17    simultaneously with multiple primers present,

18    competition between the various amplification reactions

19    result in uneven or no amplification of some target

20    sequences."

21         So they've identified a problem in the prior art,

22    which is if you're going to have various target

23    sequences, um, and have those amplified, you're going to

24    get competition between them.

25         So what do they say that their invention does that

1    distinguishes them from the prior art?  We go to the
2    next slide, Slide 21, and this is Bio-Rad talking to the
3    examiner and saying that the amended claim -- so what
4    they did was they amended their claim and they amended
5    their claim to add this word "single," which has great
6    significance.
7         So they say to the examiner, "The amended claims
8    recite a solution to this problem, a method where
9    plurality of partitions," which is the same as
10   "droplets," "each comprise a single target sequence and
11   a plurality of different primer types each specific to
12   amplify a different target sequence, but only a single
13   target sequence is amplified and detected in each
14   partition."  And they go on to say, "As stated in the
15   as-filed specification, even though the number of PCR
16   primer pairs per droplet is greater than 1" -- so
17   they're saying "we had multiple primer pairs."  But now
18   in our amended claim, there is only one template
19   molecule per droplet.  And that, your Honor, was their
20   disclaimer.  And that is the language we're asking your
21   Honor to consider -- that is our construction, those
22   words right there.
23        THE COURT:  Is that an appropriate role for a
24   markman hearing?  Isn't that -- isn't that -- obviously
25   I mean your recitation of the law, if these facts fit

1    it, um, they're not going to be allowed now in

2    litigation to take back something they've disclaimed to

3    the patent office.  But I thought I was just limited to

4    construing the language which the patent office issued.

5         Is this an appropriate time to make that legal

6    ruling?

7         MS. BROOKS:  Well we believe it is, your Honor, in

8    that that would be the way to hold Bio-Rad to their

9    disclaimer and not allow them to recapture subject

10   matter that they disclaimed in order to get over the

11   prior art.

12        Now if your Honor believes that this is not the

13   appropriate forum, then I guess it would be in a forum

14   of either a jury instruction, where the jury is

15   instructed that the claim is limited to having one

16   template molecule per droplet, and that would be in the

17   form of a jury instruction.  I assume Bio-Rad's going to

18   ignore that and their expert is going to say, "No, we

19   are not limited to having only one template molecule per

20   droplet," and therefore I guess then the appropriate

21   forum would be that we would move to strike that

22   expert's report --

23        THE COURT:  No, no, wait a minute.  I don't think

24   that's -- let me tell you what I think is appropriate,

25   but I could well be wrong.  Here's how I think the rules

1    of civil procedure work.

2         I think I construe the patents as issued, um,

3    limiting myself to intrinsic evidence unless in those

4    rare instances I have to go to extrinsic evidence, which

5    is inconsistent, because this is a jury case.  But in

6    any event, I do that.  Then their experts do whatever

7    they do and your experts do whatever they do and there's

8    pretrial motions.

9         Now, if this is a big deal, something I don't know

10   yet because, as I approach these cases, I don't know and

11   at this stage I don't want to know anything about the

12   accused device.  But once I've roughed this out now, I

13   imagine I'm going to find out a lot about the accused

14   device or devices.  And so I'm going to then have that

15   issue of whether the accused device infringes or not.

16   And that is presented in various ways.

17        And I mean there's jurisprudence right on this.

18   If you are right in what you've just argued, they're not

19   going to be able to claim that.  So I'm going to apply

20   that jurisprudence and that's going to resolve the

21   matter.  If it is not resolved prior to trial, that's

22   the whole purpose of motions in limine.  No expert is

23   going to say something that is violative of how I

24   applied the law.

25        But I must say -- and I'm not trying to shirk work

1    here, but I, um, think that moving in an orderly

2    sequence is advisable because the -- constitutionally

3    I'm limited to cases and controversies.  So it appears

4    we have one, you people are felling whole forests to

5    convince me that I do, um, but as yet I'm not exactly

6    sure of the contours of the controversy.  And I, um,

7    worry, I'll tell you candidly, that I am only one piece

8    of this larger patent and competitive battle, which of

9    course everyone is entitled to engage in.  So I'm going

10   to limit what I say until I know I have to say it.

11        And now I guess, foolishly impressed by my own

12   speech, I think maybe I will simply express no opinion.

13   I'm delighted or I'm very interested anyway to get this

14   claim, but I'm not going to address it in my markman

15   ruling.  But not addressing it does not in any way

16   suggest it is not a viable, indeed maybe a powerful

17   claim.  I express no opinion on it.  And I thank you.

18        All right.

19        MS. BROOKS:  Thank you very much, your Honor.

20   Thank you for that clarification.

21        THE COURT:  Well with that done, I think we are at

22   an end today and I do -- the matters I've taken under

23   advisement, I'll resolve, and I do thank you.  And as

24   promptly as I can.  It's been a pleasure seeing you all.

25        MR. REINES:  Thank you, your Honor.

1          THE COURT:  And we'll recess.

2          MS. BROOKS:  Thank you, your Honor.

3          (Ends, 3:15 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2

 3

 4          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

 5      do hereby certify that the foregoing record is a true

 6      and accurate transcription of my stenographic notes

 7      before Judge William G. Young, on Thursday, September

 8      10, 2020, to the best of my skill and ability.

 9

10

11

12

13

14      /s/ Richard H. Romanow 09-22-20
        _____
15      RICHARD H. ROMANOW    Date

16

17

18

19

20

21

22

23

24

25
```